**In re 5877 POPLAR, L.P., Debtor.**

**No. 01–31219–DSK.**

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

Sept. 27, 2001.

Jack F. Marlow, Memphis, TN, for debtor.

Michael P. Coury, Memphis, TN, for LaSalle National Bank.

Sean M. Haynes, Memphis, TN, Staff Attorney for United States Trustee.

## MEMORANDUM AND ORDER RE MOTION TO TERMINATE THE AUTOMATIC STAY FILED BY LASALLE NATIONAL BANK AND DEBTOR'S MOTION TO USE CASH COLLATERAL COMBINED WITH RELATED ORDERS AND NOTICE OF THE ENTRY THEREOF

DAVID S. KENNEDY, Chief Judge.

The instant contested matters before the court arise out of two motions filed under 11 U.S.C. §§ 363(c)(2)(B) and 362(d) that are governed by FED.R.BANKR.P. 9014. This is a chapter 11 single asset real estate case involving a 126 unit Comfort Inn hotel located in Memphis, Tennessee, owned and operated by the above-named debtor, 5877 Poplar Ave., L.P., a limited partnership formed under applicable Tennessee law ("Debtor" or "Debtor–in–Possession").

The first motion before the court was filed by the Debtor on August 6, 2001, and is styled, *Emergency Motion to Use Cash Collateral To Incur Indebtedness and Grant Liens Pursuant to 363 of the Bankruptcy Code and For Expedited Hearing* ("Motion to Use Cash Collateral"). The Debtor and LaSalle National Bank ("Bank"), the trustee for the registered holders of the Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass–Through Certificates, Series 1997–MCI ("Bank") entered into two postpetition interim consensual orders on August 14, 2001, and August 21,2001, authorizing the Debtor's limited use of the hotel revenues pending a final hearing. These interim consensual orders expressly reserved all the Bank's asserted legal rights regarding, for example, its interest in the hotel revenues awaiting a final ruling here. As will be seen, the Bank contends that the hotel revenues were absolutely and unconditionally assigned to it and that the Debtor's rights in the hotel revenues were terminated prior to the filing of the chapter 11 case.

The second motion before the court is the Bank's motion seeking to terminate the automatic stay under 11 U.S.C. § 362(d)(1)–(2) that was filed on August 6, 2001, styled, *Motion of LaSalle Bank National Association, f/k/a LaSalle National Bank, As Trustee for the Registered Holders of the Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass–Through Certificates, Series 1997–MC1, to Lift Automatic Stay; Expedited Hearing Requested* ("Motion to Terminate the Stay"). The Debtor filed a written objection to the Bank's motion to terminate the automatic stay on September 11, 2001. The two instant motions and the Debtor's objection were consolidated for a hearing held on September 11, 2001.

By virtue of 28 U.S.C. § 157(b)(2)(A)(G), (M), and (O) these are core proceedings. This court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and Miscell. Order No. 84–30 (W.D.Tenn.). Based on all of the pleadings, trial exhibits, statements of counsel, and the case record as a whole, the court makes the following findings of fact and conclusions of law in accordance with FED.R.BANKR.P. 7052.

Although the parties have a strong difference of opinion regarding the outcome of these consolidated proceedings, the relevant background facts are not in substantial dispute and may be briefly summarized as follows. As noted, the Debtor is a limited partnership formed under Tennessee law. It owns and operates a Comfort Inn hotel franchise located at 5877 Poplar Avenue, Memphis, Tennessee. As identi-

fied in the caption and text of its motion seeking to terminate the stay under 11 U.S.C. § 362(d), the Bank states that it is the trustee for the registered holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass–Through Certificates—arising out of a secured promissory note dated February 13, 1997, in the principal amount of $3,389,000 with a rate of interest of 9.46% resulting in a monthly payment of $29,515.40 reaching a maturity date on March 1, 2007. The outstanding balance due on the promissory note is approximately $3,267,000 and $260,000 in accrued interest as of July 27, 2001, plus expenses.

Pursuant to a deed of trust executed by the parties on February 13, 1997, the Bank asserts that the Debtor absolutely and unconditionally assigned and transferred to it all room rents and room revenues and other income from the hotel property. A license agreement was created in the deed of trust conferring upon the Debtor a duty to collect and apply rental income and revenues to service the debt.[1] The Debtor funds the operation of the hotel and makes payments to the Bank with the revenues generated by the hotel, but no payments have been made to the Bank since October 1, 2000. On July 24, 2001, the Bank sought to terminate the Debtor's license to collect rents and room revenues by issuing a termination letter dated July 24, 2001. The Debtor, however, continues to collect rents and profits and is operating the hotel in accordance with the prior consensual orders, awaiting the outcome of a final ruling here.

On July 27, 2001, the Debtor filed a chapter 11 case prior to the scheduled foreclosure sale that was set for July 30, 2001. Without opposition and with the approval of the court, the Bank continued (*i.e.,* reset) the foreclosure sale to a later date. On August 20, 2001, the court approved the entry of an interim consent order modifying the automatic stay to allow the Bank to orally "cry-out" and conduct a foreclosure sale in order to ascertain the highest bid for the property subject to the pending motion to terminate the automatic stay and motion to use cash collateral; however, it was expressly understood that no indenture trustee's deed would be recorded, absent bankruptcy court authorization. The Bank submitted the highest oral bid at the foreclosure sale for the full amount of the indebtedness.

The Bank primarily asserts that under the existing circumstances the Debtor has no legal rights to the use of the hotel revenues since the Debtor absolutely assigned rents and profits generated from the hotel to the Bank in the document entitled, "Deed of Trust, Assignment of Leases and Rents, and Security Agreement" ("deed of trust"). The exhibits attached to the Bank's instant motion to terminate the automatic stay reveal that the deed of trust was "absolutely assigned" multiple times among three different mortgage creditors; however, the Debtor's participation in an assignment occurred only in the deed of trust instrument. Additionally, the Bank asserts that it terminated the Debtor's license to collect the rents and profits generated by the hotel prior the filing of the chapter 11 case as manifested in the termination letter dated July 24, 2001. The Bank also asserts that it is not adequately protected mandating termination of the automatic stay pursuant to 11

---

**1.** *See* Collective Exhibit One; ¶ 5 page 2 of the Deed of Trust, Assignment of Leases and Rents, and Security Agreement stating as follows: "... the Borrower shall have the right under a license granted hereby ... to collect upon all of said Rents and Profits arising from or out of such leases and other agreements or any renewals or extensions thereof...."

U.S.C. § 362(d)(1) and prohibition of the Debtor's use of the hotel revenues.

The Debtor, *inter alia,* asserts legal rights to the rents and profits generated by the hotel as "cash collateral" under 11 U.S.C. § 363(a). Relying on the assignment language in the deed of trust and its asserted and purported ambiguity, the Debtor suggests the contractual language only provides the Bank with "additional collateral and security" for the indebtedness. The Debtor suggests that the assignment language relied upon by the Bank merely conveys a security interest in favor of the Bank. Simply stated, the Debtor argues that the Bank cannot have it both ways. The Bank suggests that it secured an absolute assignment of the rents while concomitantly creating a security interest in the same sentence in the subject deed of trust. Moreover, the Debtor refutes the Bank's assertion that it is not adequately protected because the Bank, among other forms of adequate protection, has a postpetition lien recognized under 11 U.S.C. § 552(b) and insurance coverage of more than $12 million in place on the subject property to protect the interests of the Bank (*i.e.,* $7.25 million on the building and $5 million in casualty insurance).

This case is a single asset real estate case as contemplated under sections 101(51B) and 362(d)(3) of the Bankruptcy Code ("Code").[2] The Code broadly defines what constitutes property of the estate as including all legal or equitable interests of the debtor in property as of the commencement of the case, wherever they are located and by whomever they are held by virtue of section 541(a)(1). *In re Johnston,* 209 F.3d 611, 613 (6th Cir.2000); *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Specifically, "[p]roceeds, product, offspring, rents, or profits of or from property of the estate ..." are expressly included in this broad definition. *See* 11 U.S.C. § 541(a)(6).

"Cash collateral" is defined under 11 U.S.C. § 363(a) as follows:

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, prod-

---

**2.** 11 U.S.C. § 101(51B) states as follows:

(51B) "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000;

11 U.S.C. § 362(d)(3) states as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period)—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

ucts, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

■ In order for a debtor's property, such as rents or profits, to constitute cash collateral under section 363(a), the property also must qualify as property of the estate because, under section 363(c)(2), cash collateral includes only property "in which *the estate* and an entity other than the estate have an interest...." *In re Kingsport Ventures, L.P.*, 251 B.R. 841, 845–46 (Bankr.E.D.Tenn.2000) (citing section 363(a)). Thus, the property or cash collateral sought to fund the Debtor's reorganization plan must first be classified as property of the estate under section 541(a) of the Code.

■ Although the Bank, in light of the defaults, properly sought to terminate the Debtor's license to collect rents prior to the commencement of the chapter 11 case in an effort to cut off any equitable or legal rights to such rents or revenues, the Debtor, indeed, still has rights in the hotel revenues, which are cash collateral under a totality of the particular facts and circumstances and applicable law. The Bankruptcy Reform Act of 1994 amended the definition of section 363(a) to include "fees, charges, accounts or other payment for the use or occupancy of rooms and other public facilities in hotels, motels, and other lodging properties." 3 COLLIER ON BANKRUPTCY ¶ 363.03[3][b][i] (15th ed.1997). The court holds that a literal reading of

section 541(a)(6) includes profits generated from the hotel which compose this bankruptcy estate property under a broad, yet proper, reading of property of the estate under section 541(a)(6). Also, the express inclusion of "payments for the use or occupancy of rooms" in the amended section 363(a) assists the court in its conclusion that the room revenues constitute property of the estate and cash collateral in this chapter 11 bankruptcy case.

It is the Debtor, by virtue of its status as the debtor-in-possession in this chapter 11 case, that requests the authorization to use cash collateral under 11 U.S.C. § 363(c)(2)(B) and pursuant to FED. R.BANKR.P. 4001(b).[3] At the hearings to use cash collateral and for relief from the automatic stay, the Debtor has the burden of proof on the issue of adequate protection as required under sections 363(o)(1) and 362(g)(2) of the Code. In its opposition to the Debtor's request to use cash collateral, the Bank also has filed a motion to terminate the automatic stay for cause asserting lack of adequate protection. *See* 11 U.S.C. § 362(d)(1). The threshold issue for the court's determination is whether the debtor is entitled to use the room rents/revenues as cash collateral in light of the prepetition assignment in question.

■ A judicial determination of whether the absolute assignment occurred requires analysis of the assignment and intent of the parties. "When the lender has a received a purported absolute assignment of rents, careful review of the intent and practices of the parties and of applicable nonbankruptcy law will be appropriate to determine whether the assignment is truly absolute or is absolute only

---

**3.** *See also* 11 U.S.C. §§ 1101(1) and 1107(a) (providing the statutory basis that affords the chapter 11 debtor-in-possession all the rights and powers of the bankruptcy trustee includ-

ing the power to use cash collateral under 11 U.S.C. § 363(c)(2)). *See also* FED.R.BANKR.P. 9001(10).

in form." 3 COLLIER ON BANKRUPTCY ¶ 363.03[3] (15th ed.1997); *In re Turtle Creek*, 194 B.R. 267 (Bankr.N.D.Ala.1996); *In re Dacey*, 80 B.R. 206 (D.Nev.1987).

▮ Assignments of rents are interests in real property requiring an examination of the details of their creation and a definition in accordance with law of the situs of the property or state law where the property is located. *In re Jason Realty, L.P.*, 59 F.3d 423, 427 (3rd Cir.1995) (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). Courts in Tennessee distinguish grants of security interests and absolute assignments as two entirely distinct methods for creating credit against collateral which a party may borrow funds. *In re Kingsport Ventures, L.P.*, 251 B.R. 841, 846 (Bankr.E.D.Tenn.2000) (citing *American Trust & Banking Co. v. Twinam*, 187 Tenn. 570, 216 S.W.2d 314, 319 (1948); *Nashville Trust Co. v. First Nat'l Bank*, 123 Tenn. 617, 134 S.W. 311, 314 (1911); *In re BVT Chestnut Hill Apartments, Ltd.*, 115 B.R. 116, 117 (Bankr.M.D.Tenn. 1990); *In re Harbour Town Assocs., Ltd.*, 99 B.R. 823, 824 (Bankr.M.D.Tenn.1989)). "Under Tennessee law an assignment of rents is presumed to be a pledge of rents as security." *Kingsport Ventures, L.P.*, 251 B.R. at 846–47 (quoting *Harbour Town Assocs., Ltd.*, 99 B.R. at 824; *BVT Chestnut Apartments, Ltd.*, 115 B.R. at 117). The determination of whether an assignment of rents is absolute or merely a pledge of security requires a thorough analysis of the language and provisions of the assignment.[4]

In this case, two assignments exist. The first assignment occurred between the banking institutions holding rights to the debt instruments. Boatmen's National Mortgage assigned its rights to Nations-Banc Mortgage Capital Corporation ("Nationsbanc") on February 20, 1997, and Nationsbanc assigned its rights to LaSalle National Bank ("LaSalle") on May 20, 1997, resulting in LaSalle's current status as the holder of the deed of trust and promissory note. However, the purported assignment arising between the Debtor and Bank exists solely in the deed of trust and states, in relevant part, as follows:

> *As additional collateral and further security for the indebtedness,* to the fullest extent permitted by applicable law, the Borrower does hereby assign to the Lender and grants to the Lender a security interest in all of the right, title and the interest of the Borrower in and to any and all Intangible Personalty (as defined in the Personalty Rider attached hereto), and the Borrower agrees to execute and deliver to the Lender such additional instruments, in form and substance satisfactory to the Lender, as may hereafter be requested by the Lender to evidence and confirm said assignment; provided, however, that acceptance of any such assignment shall not be construed as a consent by the Lender to any of the foregoing or to impose upon the Lender any obligation with respect thereto.
>
> *As part of the consideration for the indebtedness secured hereby, Borrower hereby absolutely and unconditionally*

---

4. *Kingsport Ventures, L.P.*, 251 at 847; *see also* Randy Rogers, *Assignment of Rents Clauses Under California Law and in Bankruptcy: Strategy for the Secured Creditor*, 31 HASTINGS LAW JOURNAL 1433, 1453 (1980) (citing factors in analyzing a purported absolute assignment as constituting a pledge of rents for security as: 1) the failure to clearly express the assignment as absolute and unequivocal; 2) use of the term "additional security" before the rent assignment clause of the document; 3) the failure to provide distinct headings or separate paragraphs denoting the assignment apart from the collateral securing the indebtedness).

*assigns and transfers to Lender and grants to the Lender a security interest in any and all leases and other occupancy or use agreements (whether oral or written)* now existing or hereafter made and affecting the Premises as such leases and other agreements may have been, or may from time to time be hereafter, modified, extended, renewed, with all the security deposits, rents (including, without limitation, room rents and room revenues, if any), issues, profits, revenues and other income of the premises from time to time accruing therefrom (the "Rents and Profits"), and the acceptance of this assignment and the collection of Rents and Profits shall not constitute a waiver of any rights of the Lender under the terms of the Loan Documents. So long as there shall exist no Default or Event of Default, the Borrower shall have the right under a license granted hereby (but limited as provided elsewhere in this Security Instrument and the Loan Agreement) to collect upon all of said Rents and Profits arising from or out of such leases and other agreements or any renewals or extensions thereto, or from or out of the Premises or any part thereof, and the Borrower shall receive such Rents and Profits, as a trust fund to be applied, and the Borrower hereby covenants to so apply same, to the payment of taxes and assessments upon the Premises before penalty or interest are due thereon, to the cost of such insurance and of such maintenance and repairs as is required by the terms of the Security Instrument and Loan Agreement, and to the payment of interest and principal and other amounts becoming due on the Loan, before using any part of the same for any other purposes.

Collective Exhibit One, Deed of Trust, Assignment of Leases and Rents, and Security Agreement, Page 2 ¶ 4 and ¶ 5.

Prior to articulating a conclusion regarding the effect of the language of the deed of trust, it is noted that courts ordinarily are reluctant to construe assignments as absolute, especially when such a result fails to reflect the intent of the parties. *Federal Deposit Ins. Corp.*, 929 F.2d at 1036 & 1038. The court recognizes that general principles of Tennessee contract law apply in the assignment analysis. *Kingsport Ventures, L.P.*, 251 B.R. at 847. Courts must interpret contracts as written, even where its terms seem harsh or unjust absent proof of fraud or mistake. *Gray v. Estate of Gray*, 993 S.W.2d 59, 64 (Tenn. Ct.App.1998), *permission to appeal denied*, (Tenn.1999). It is fundamental that ambiguous language in a contract is construed against the drafter. *In re Delta America Re Insurance Co.*, 900 F.2d 890 (6th Cir.1990). Ambiguity results, under Tennessee law, when the terms in the contract may fairly be understood more ways than one. *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn.1973).

The Bank, or its assignor, drafted the deed of trust, so the deed of trust along with any ambiguities must be construed against the Bank in favor of the Debtor in the event of an ambiguity. The court recognizes the assignment language in the deed of trust utilizes the adverbs "absolutely" and "unconditionally" prior to the verbs assign and transfer on the second page of the deed of trust; however, the same sentence must be read in the conjunctive since the language following the assignment reads "... and grants the Lender [Bank] a security interest ..." in all room rents and revenues. Accordingly, the court concludes that the language seems to reflect an intent to create a security interest.

The inconsistent and contradictory language contained in the deed of trust,

emphasized and highlighted by Debtor's counsel, prohibits the court, under the circumstances and applicable law, from concluding that the purported assignment was absolute when it concomitantly provides additional security. *See* Collective Trial Exhibit # 1; Deed of Trust, Assignment of Leases and Rents, and ·Security Agreement, Page 2, ¶ 5 cited in full, *supra.* Furthermore, the presumption that an assignment operates as security for a debt complicates the Bank's burden of rebutting the presumption despite the reference to the assignment as "absolute" in the deed of trust. "Statements within the assignment that the assignment was intended to secure a debt is strong evidence that the assignments are in fact a pledge of security, even if the assignment is referred to as absolute." *Kingsport Ventures, L.P.,* 251 at 847 (citing *BVT Chestnut Hill Apartments, Ltd.,* 115 at 117; *Harbour Town Assocs., Ltd.,* 99 at 825). The use of such language discussed above and the language commencing the fourth paragraph of the second page of the deed of trust stating "[A]s additional collateral and further security for the indebtedness ..." compels the court to honor the presumption and apparent intent of the parties that the assignment serves as a pledge of security, not an absolute assignment.

While the court expressly recognizes and relies heavily on the scholarly and eloquently written opinion of the Hon. Richard Stair in *In re Kingsport Ventures, L.P.,* 251 B.R. 841 (Bankr. E.D.Tenn.2000), as well as the similarities between the *Kingsport Ventures, L.P.,* case and this case, the assignment in this case can be clearly distinguished. In *Kingsport Ventures, L.P.,* the assignment in question existed in an independent document entitled, "Assignment of Leases and Rents," containing paragraph headings in bold fonts (*i.e., 1. Present Assignment, 2. Remedies of Assignee, etc.*). In

this case, the assignment exists only in the security instrument/deed of trust. The fact that the assignment existed in a separate and independent document from the mortgage instrument distinguishes this case from *Kingsport Ventures, L.P. See In re Jason Realty, L.P.,* 59 F.3d 423, 428 (3rd Cir.1995) (holding that an absolute assignment existed because an independent assignment document was executed, separate from the mortgage instrument, which "impressed" the court and facilitated the court's conclusion that rents were not estate property or cash collateral). Moreover, the language in the assignment document in *Kingsport Ventures, L.P.,* eliminated any doubt possibly inferred by the parties by clarifying that the assignment is "not an assignment for additional security only." *Kingsport Ventures, L.P.,* 251 B.R. at 848. Here, no such clarification exists in the documents. The provisions addressing the license to collect rents and the termination of the license also differ.

The parties in *Kingsport Ventures, L.P.,* granted the debtor a license to collect rents in the assignment document that was automatically terminated/revoked upon default without the necessity of action by the Assignee. *Id.* (citing language in the assignment that the license "shall automatically be revoked"). Here, the deed of trust provision required the Bank to take affirmative action in the event of default to terminate the license as manifested in the language as follows: "... to terminate the aforesaid license granted ... and to enter upon the Premises...." *See* Collective Exhibit One, Paragraph 7 of Deed of Trust, Assignment of Leases and Rents, and Security Agreement on page 4 labeled "*Rents and Profits.*" The language here indicates that a prerequisite to the right to collect the rents is entry upon the premises, and a true or absolute assignment

should clearly demarcate that a creditor is entitled to the rents without the requirement of re-entry. *See* Randy Rogers, *Assignment of Rents Clauses Under California Law and in Bankruptcy: Strategy for the Secured Creditor*, 31 HASTINGS LAW JOURNAL 1433, 1453 (1980). The juxtaposition of the license termination provision with the requirement of entry suggests that re-entry is a condition precedent to the Bank's right to the rents. *Id.* An absolute assignment, by its nature as being absolute, requires no action to effectuate a termination. Thus, the court concludes, considering a totality of the particular facts and circumstances and applicable law, that the assignment in this case fails to constitute an absolute assignment. The Bank's mere letter of termination, standing alone, is insufficient. Thus, the Bank has failed to rebut the presumption under applicable Tennessee law that the assignment of rents is presumed to be a pledge of rents as security.

The court also notes a final factor that distinguishes this case from *Kingsport Ventures, L.P.* In this case, upon full payment of the debt, the Bank would have no interest in the rents and room revenues as manifested in the deed of trust provision entitled, *"Release."* After the Debtor pays off the entire amount of indebtedness, the Bank, here ". . . shall release this Security Instrument."[5] The release provision and language in the deed of trust compel this court to conclude that the assignment provides additional security for the indebtedness, not an absolute assignment. Apparently, the Debtor did not assign its rights to the rents and revenues *ad infinitum* and retained some interest in the rents. Therefore, the court must find, considering a totality of the particular facts and cir-

cumstances, that the rents and room revenues generated by the hotel constitute "cash collateral" under the broad definition contained in section 363(a) and a proper reading of section 541(a)(6).

The next issue for the court to further address is the Bank's motion to terminate the automatic stay. The Bank also asserts it is entitled to a termination of the automatic stay under section 362(d)(2)(A) and (B) because the Debtor has no equity in the subject property and the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2)(A) and (B). The Debtor refuted this argument at the hearing by asserting equity exists in the property evidenced by, for example, the letter of intent of Hospitality Investment Services International, L.L.C., indicating a prospective purchase price of $4 million expected to close on October 1, 2001. It is noted that the $4 million will adequately satisfy the debt owed to the Bank. The Debtor disproved the assertion that the property (*i.e.*, the room revenues and rents) is not effective for the reorganization because the rents represent the Debtor's sole source of funding to operate the hotel and to continue to administer the chapter 11 estate. Additionally, the court cannot find, under a totality of the existing circumstances and at this stage of the case administration, that no reasonable possibility of a successful reorganization (or liquidation) within a reasonable time exists. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Finally, the Debtor successfully met the burden of the section 362(d)(1) adequate protection issue as required un-

**5.** *See* Collective Trial Exhibit # 1; Deed of Trust, Assignment of Leases and Rents and Security Agreement ¶ 12 (entitled, *"Release,"* stating "[U]pon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.").

der section 363(o)(1). The Debtor's counsel stated that more than adequate insurance of $12 million (*i.e.*, $7.25 million on the building and $5 million in casualty insurance) exists on the property. Recognizing the requirements in section 361 governing the concept of adequate protection as required under section 363, the Debtor stated the present ability to apply room revenues to pay actual, necessary expenses, including overhead and repairs, incurred in the operation of the hotel to satisfy the current and delinquent obligations owed to the Bank. *In re Epstein*, 26 B.R. 354, 358 (Bankr.E.D.Tenn.1982). The Debtor also acquiesced to grant postpetition replacement liens as ordinarily required under section 361(2) as well as a prompt filing of a disclosure statement and a plan within 14 days after entry of this order without legal prejudice to the Bank to seek further relief in the event of a change of circumstances. Finally, the Debtor agreed to allow the Bank to inspect the premises upon reasonable request and also to provide copies of all operating reports to the Bank without delay. Failure to comply with any of the adequate protection measures may result in the loss of the use of the cash collateral. The Debtor's acquiescence to placate some of the Bank's concerns allows this court to achieve the bankruptcy court's conscious objective of preserving the Debtor's ongoing business while concomitantly striking the proper equitable balance between the rights of the creditor and debtor. *See Jason Realty, L.P.*, 59 F.3d at 429.

In summary, the court finds, considering a totality of the particular facts and circumstances and applicable law, that the hotel revenues are "cash collateral" and that the assignment in the deed of trust fails to constitute an absolute assignment; that the assignment effectively provided additional security for the underlying indebtedness; and that the Debtor has met the burden of proof as required under sections 362(d)(1)–(2) and 363(o)(1) by proving that adequate protection existed as manifested by the equity in the property and sufficient insurance on the property, the Debtor's ability to pay actual and necessary operating expenses following the rationale of the *Epstein* case from income streams generated by the hotel, and the Debtor's assurance of a prompt filing of the disclosure statement and plan.

**IT IS ORDERED:** That the motion filed by the Debtor to use cash collateral is hereby granted, and the motion to terminate the automatic stay filed by the Bank is denied in accordance with the foregoing.

**IT IS FURTHER ORDERED AND NOTICE IS HEREBY GIVEN** that a case management status conference under 11 U.S.C. § 105(d)(1) will be held on October 19, 2001, at 10:00 a.m. to discuss, *inter alia*, a possible sale of the hotel and the filing of Debtor's disclosure statement and plan; and the final hearing on the Debtor's motion for authorization to use cash collateral under 11 U.S.C. § 363(c)(2)(B) and Fed.R.Bankr.P. 4001(b)(2) will be considered on the merits also on October 19, 2001, immediately following the aforesaid case management status conference.